**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

**KALIEF WILLIAMS,**

                                  Plaintiff,         **COMPLAINT AND**
                                                                           **JURY DEMAND**

        vs.

**THE RUSSO'S PAYROLL GROUP, INC. D/B/A**
**RUSSO'S ON THE BAY, FRANK RUSSO, JR.,**
**ROBERT "ROBBIE" RUSSO, AND GIUSEPPE**
**"JOE" VACCA,**

                                  Defendants.

-------------------------------------------------------------x

## NATURE OF THE ACTION

Plaintiff Kalief Williams experienced a racially stratified and discriminatory workplace at Defendant catering hall, Russo's on the Bay in Howard Beach, where management casually and continuously used racial slurs and racial stereotypes. At events held at Russo's, racial mistreatment was commonplace by the staff, by guests attending parties and by local residents. Despite reporting this conduct to management multiple times, the racially motivated harassment persisted, culminating in Defendant Robbie Russo's violent racial attack of Kalief Williams. Following the assault, he was denied assurances that he would not have to work alongside Robbie Russo, Kalief Williams was constructively terminated from the dangerous and damagingly racist work environment at Russo's on the Bay.

## THE PARTIES

1. **Kalief Williams** ("Williams") is a Black man, who was 26 years-old and residing in Queens, N.Y., when he was hired by The Russo's Payroll Group in May of 2015.

2. **The Russo's Payroll Group, Inc. D/B/A Russo's On The Bay** ("Russo's") is a domestic business corporation, registered with the New York Department of State since 2013 and located in Howard Beach, N.Y. The Russo's Payroll Group, Inc. operates Russo's On The Bay and Vetro Restaurant and Wine Bar. Russo's On The Bay is listed on it's website as one of "The Russo Brands," which also include Sweet Elite Cakery, Vetro Restaurant and Wine Bar, and Giardino.

3. Russo's employs roughly 250 workers. Russo's was, at all times relevant herein, Williams' "employer" within the meaning of all relevant Federal and New York City laws.

4. **Frank Russo, Jr.** ("Russo") is the "Owner and Visionary" of Russo's On The Bay and supervised Williams.

5. **Robert "Robbie" Russo** ("Robbie") is Frank Russo, Jr.'s son and, as a Manager at Russo's on the Bay, supervised Williams.

6. **Giuseppe "Joe" Vacca** ("Vacca") was a maître d' at Russo's and supervised Williams.

## JURISDICTION

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1376 for civil actions arising under the laws of the United States and supplemental jurisdiction.

8. Plaintiff has exhausted his administrative remedies by dual-filing a charge with the United States Equal Employment Opportunity Commission and the New York City Commission on Human Rights and has received a Notice of Right to Sue.

9. Contemporaneous with commencement of this action, a copy of this complaint was served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of Section 8-502 of the New York City Administrative Code.

## VENUE

10. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim occurred in the Eastern District of New York.

## FACTS

11. Russo's On the Bay was opened in 1987 and is operated by Frank Russo, Jr. and his family. Russo's is a catering hall located in Howard Beach, Queens and features cuisine "from the shores of Italy." It hosts lavish events, including $250-a-plate Cinderella-themed Sweet 16s, society and cultural events, and weddings, as well as local political fundraisers, Police Balls, and Sergeant Balls.

12. In May 2015, Williams was hired to work as a server at Russo's On The Bay and their sister restaurant, Vetro Restaurant and Wine Bar ("Vetro"). His brother, Kajeen Lucas ("Lucas"), was hired by Russo's at approximately the same time.

**Russo's Maintains a Racial Hierarchy in their Workforce**

13. From the very first day of work, Williams immediately observed that Black people were employed at Russo's in entry level positions, whereas management and higher-paying roles were primarily occupied by whites and light-skinned Latinos.

14. During Williams' tenure, there were no Black managers, captains, or maître d's. People of color were disproportionately represented in lower-visibility, "back of the house" positions at Russo's, including valet, server, runner and kitchen worker.

15. Moreover, pathways for growth were deliberately opaque. Russo's neither posted promotional opportunities within the restaurant nor announced them to the staff. Williams and Lucas had no way of knowing about open positions and were not privy to the application process for supervisory roles. Promotions were by "tap on the shoulder" and supposedly included "tests" that were held secretly and by invitation only. Many on Russo's staff only learned of job openings when a new person was already hired and began in that position.

16. Managers earned a higher hourly rate and a greater percentage of the tip pool, as some tips were shared and allocated on a hierarchical point system and managers received the most points. Russo's welcomed Black people and people of color in lower-paying positions. In fact, Russo's held "hospitality job expos" to openly encourage new applicants for positions with low compensation. Dishwashers, "bus boys" and cleaning positions were almost all held by Latinos.

17. During Williams' tenure, he witnessed many qualified Black people that were passed over for promotion, and witnessed Russo's promote less qualified applicants that were not Black and often newcomers. Jemoy Bailey, Delvian Flemmings, and Ashley

Joseph were all seasoned, hard-working Black employees that were not promoted while Williams worked at Russo's.

18. Williams' work environment was characterized by these racial obstacles to growth and the constant visual reminder of inferiority as exemplified by the racial divide in Russo's workforce.

19. White employees received preferential treatment in assignment to lucrative events. Williams was often the first to be sent home if there were too many employees booked for a party, even though he arrived at the event before the white employees who were not asked to leave. Williams complained to Jaclyn Ceparano in Human Resources that he believed he received less favorable schedules than white employees because of his race.

### Racial Slurs Permeate Russo's Workplace Culture

20. Employees, especially managers, used the word "nigger" constantly at Russo's, including when they addressed or described Williams and Lucas. They used these slurs in front of the entire staff and sometimes even guests.

21. Giuseppe "Joe" Vacca ("Vacca"), a maître d' who supervised Williams, called him a nigger multiple times a week, including in front of others. He would say things like, "look at this nigger," when referring to Williams, or refer to Williams as "my nigger."

22. Williams told Vacca that he couldn't talk to him like that, but he still wouldn't stop.

23. Once, when Williams was within earshot in the kitchen area, Vacca said about him, "I don't like that fucking nigger," to another supervisor. At the end of the shift on that day, Williams did not receive his full share of the tip money.

24. Vacca called Williams and his brother Kajeen Lucas ("Lucas") "the nigger brothers." In front of the staff and guests, Vacca would use that phrase to call to them, or would make gratuitous remarks like, "there goes the nigger brothers."

25. Lucas also told Vacca to stop. He told Vacca that he didn't consider his use of the word nigger to be a joke.

26. One night at work, Vacca had been calling Lucas nigger throughout his shift and he could not take it any longer. He saw the owner, Frank Russo, Jr ("Russo"), on the floor of the ballroom and he pulled him aside. He told him that Vacca had been calling Black employees nigger and he wanted him to stop. Russo said he would talk to him, but he didn't stop and nothing changed.

27. Vacca and another supervisor, Reinaldo Avila, would often call Black women "ratchet," a derogatory racial term. Vacca called almost every Black female employee ratchet to their face. In 2016, ratchet was defined on Urban Dictionary as a "diva, from urban cities and ghettos" and in The Online Slang Dictionary as "nasty, ghetto, or trifling." He never called the white female employees ratchet. Many asked him to stop, but he did not. Sometimes they would call a Black party ratchet, but never white parties.

28. Vacca and Russo would constantly make comments about women's bodies that were disgusting and degrading, and talk about women who they wanted "to bang." Some sexual comments were about Black women's bodies in particular.

29. Racial hatred, stereotypes and mistreatment were commonplace at events held at Russo's, both by the staff, guests attending parties and residents of Howard Beach. When walking outside on the block between Vetros and Russo restaurants, people on the street were sometimes abusive and other times afraid when encountering Black employees of Russo's.

30. In August 2016, a manager referred to Muslim event at Russo's as looking like an "ISIS training." Managers notified the staff whenever there was a predominantly Black event that they should not expect to earn much in tips from these guests.

31. Guests at events at Russo's would play Trump rallies on TV screens and would cheer when Trump promised to ban Muslims and get rid of Mexicans from the United States. One of the managers at Russo's openly identified as a white supremacist.

### Williams is Racially Assaulted

32. On September 4, 2016, Williams was working at a party under Robbie Russo ("Robbie"), who was the Manager assigned to the party. After 1:30 A.M., Robbie came onto the ballroom from the back kitchen and started yelling and cursing at the crew about finishing up. By that time, the remaining crew consisted of Frank Russo, Jr. and some other workers, including at least five Black people.

33. When Williams assured Robbie that they were on schedule, he began ranting and screaming directly at Williams. He called Williams a "lazy fucker" and then began escalating the profanity and calling Williams a nigger multiple times.

34. Russo asked Robbie to leave the room and accompanied him as he stormed out, yelling back at Williams that he was a "stupid fucking nigger" and "I'm tired of these

7

stupid niggers." Russo interrupted and then Robbie threw his walkie-talkie down and it shattered.

35. Soon after Robbie's violent tirade, Russo left the premises, knowingly abandoning Williams and the remaining Black workers at the mercy of a raging manager. As the owner of the company, he did not take interim measures to protect anyone from further discriminatory harm. He did not appoint anyone to ensure that employees got home safely. He did not remove this menacing manager from the premises, but instead deliberately licensed Robbie to continue to wreak havoc upon unprotected Black workers.

36. When Russo departed, Williams tried to quickly make his escape from the building. He ran downstairs to the basement to the manager's office to return his work jacket and pick up his tip money.

37. Robbie ran to find Williams and ten minutes later cornered him downstairs. With Russo gone, Robbie tried for a second time to instigate a physical reaction by purposely bumping into Williams' shoulder, calling him names and jumping towards his face. Two female employees saw what was happening and stepped in front of Williams in order to protect him from Robbie. Robbie kept screaming at Williams to provoke him to fight back, saying, "so what do you wanna do?"

38. Williams knew he could not even defend himself or he would lose his job or worse. Williams replied, "What Imma do is go home." He tried to get out of the manager's office but Robbie kept stepping in front of him, blocking his path and not letting him leave. When Williams finally got out of the office, Robbie followed after him ranting and threatening, "I should break your jaw, I should punch you in the face" and hollering at Williams, "I should fuck you up."

8

39. Even after he got out of the office, Robbie kept pushing Williams from behind. Several others had to step in and physically hold Robbie back as Williams tried to get through the door and out to the parking lot. Another female co-worker screamed at Robbie to "Leave [Williams] alone!"

40. Joanna, the maître d', came out and pulled Williams back into the manager's office to shield him from Robbie. But Robbie would not leave and kept banging on the closed door to the manager's office, trying to get in and slamming other doors. Finally, Joanna called up Russo and pleaded for him to come back and remove Robbie from the premises because he was trying to beat up Williams.

41. Williams then called a taxi from inside the office instead of walking out on the street to the bus. While he waited for the taxi, he hid in the locker room where managers never went, in case Robbie came back again to attack him.

**Black Workers are not Safe at Russo's**

42. When Williams was 16, he went with his friends to a Chinese restaurant in Howard Beach, right next to Russo's. When the group of Black friends came out of the restaurant, they were chased by a group of at least ten white boys with knives and sticks. They ran for their lives for six or seven blocks. They were only saved by jumping on an oncoming bus heading back in the direction of their home in Rockaway.

43. Howard Beach, Queens, is stained with a history of hate crimes, including the murder of an African-American man, who was chased onto a highway by a mob of white youths in 1985 and the attack of three African-American men with baseball bats by white men in 2005. Its population in 2016 was 84% white and 2.5% African-American,[1] and

---

[1] Retrieved from http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF.

many of the white residents were Italian-Americans who moved to Howard Beach in the 1940s and 1950s.  To this day, many Black people still avoid Howard Beach, especially at night.

44.   During his tenure at Russo's, Williams observed and heard about the close ties between the Russo family and the New York City Police Department ("NYPD"). He also heard allegations that the family business is connected to organized crime.[2]

45.   Williams was so frequently stopped by the NYPD during his walk to the Q53 bus stop from Russo's that he began wearing his recognizable Russo's necktie to avoid any trouble or spending part of his tip money to take a taxi home.

### Russo's Fails to Investigate Racial Assault and Protect Black Workers

46.   Neither on the night of the assault, nor even on the next day, did anyone at Russo's follow up with Williams to see if he needed medical or psychological care, or to let him know how the company would be handling the racial assault.

47.   On September 6, Williams proactively contacted Jaclyn Ceparano ("Ceparano"), in Human Resources at Russo's. She was entirely unaware that anything had transpired. Neither Frank Russo, Jr., Joanna, nor Robbie, all of whom had a duty to report the incident, had even informed Human Resources.

48.   When Ceparano heard, she said Robbie should not even be working at Russo's at all. She said that she would talk to General Manager, Philip Montante ("Montante") and

---

[2] A Gambino associate testified that the crime family gets a portion of the revenues of Russo's. Vera Chinese. (March 15, 2012)  *Russo's on the Bay former employee slaps catering hall with labor lawsuit.* Retrieved from http://www.nydailynews.com/new-york/queens/russo-bay-employee-slaps-catering-hall-labor-lawsuit-article-1.1038952. The Federal Bureau of Investigation alleged that Frank Russo was a Gambino associate who visited Gene Gotti in prison. Greg B. Smith (February 22, 2005) HALL CATERS TO MOB? IT'S NEWS TO POLS.  Retrieved from http://www.nydailynews.com/archives/news/hall-caters-mob-news-pols-article-1.623120.

that in the meantime, Williams should not file a police report because then it would be "out of their hands."

49. Two days later, on September 8, 2016, Williams arrived at Russo's to meet with Montante in the very place where only days earlier, he had been attacked. Montante made him sit and wait over an hour to talk to him while he spoke with Russo. Fearful, Williams waited inside his car, not knowing if Robbie would show up at any time.

50. When he finally met with him, Montante made no apologies and expressed no concern. Instead, he told Williams that "Kids make mistakes and kids are gonna be kids."

51. When Williams asked whether he would have to work again with Robbie, Montante was evasive and told him Robbie would return to work after a brief suspension. Williams told him that a suspension was not a satisfactory assurance of protection.

52. Williams departed and reached out to Frank Russo, Jr. to seek concrete plans that would assure him protection against future violence and racial discrimination, but no specific interim or remedial measures were offered.

53. Instead, Russo's put Williams back on the work schedule, though his concerns had not been addressed. In response, Williams again asked Ceparano and Russo what they were going to do address racial discrimination and curtail future violence. Neither responded to this query.

54. In the meantime, no witnesses were interviewed, no investigation or findings were documented, no measures were instituted to address and condemn racial discrimination among the staff, and no apologies were made. Even the video tapes for the evening in question were not preserved.

55. The slurs used by managers, the racialized climate and the segregated workforce were left knowingly unremediated by Russo's, despite the complaints to the managers and to Frank Russo, Jr. himself. The racial aggression and hostility was permitted to intensify when Frank Russo, Jr failed to intervene effectively by turning his back for months and again when Robbie physically assaulted Williams.

56. Russo's deliberately did not take corrective measures to guarantee Kalief's safety or to rectify the hostile work environment because they intended to continue business as usual with racial discrimination as a routine feature of the workplace culture at Russo's and with Russo in his same position in the company. In late September, after Russo's put Williams back on the schedule without responding to his multiple requests for clear and defined protective measures, Williams was constructively terminated. For Williams, continuing to place himself in physical and psychological jeopardy was unendurable.

### Robbie Russo Resumes his Supervision of Black Workers

57. After the racial assault, Robbie traveled in Europe and then resumed work at Russo's, in the very same role supervising Black workers.

58. Everyone on staff knew about the racial attack on Williams, some even witnessed it. For the Black people that remained at Russo's, the silence from management about the racial assault that occurred on the premises was a powerful confirmation of the message that had already been communicated by the permissible use of slurs and the racial divide on the staff: racial discrimination at Russo's is acceptable behavior.

59. In contrast, Williams was jobless and emotionally devastated from being treated every work day like less of a person, and then narrowly averting his second racial assault in Howard Beach. He had nightmares about the building, replayed the event in his head, experienced depressive moods and anxiety and sought out support from his pastor.

FIRST CAUSE OF ACTION

**Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq.**

60. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

61. Williams was subjected to a hostile work environment and discriminated against in the terms and conditions of his employment, including by constructive discharge, because of his race.

62. As a direct and proximate result of Defendant's discrimination, he has suffered and continues to suffer severe mental anguish and emotional distress.

SECOND CAUSE OF ACTION

**Race Discrimination in Violation of Chapter I, Title 8 of the Administrative Code of New York, § 8-107(1)(a) of the New York City Human Rights Laws**

63. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

64. Williams was discriminated against in the terms and conditions of his employment including by constructive discharge, was subjected to a hostile work environment and was treated less favorably because of his race.

65. As a direct and proximate result of Defendant's discrimination, Williams has suffered and continues to suffer severe mental anguish and emotional distress.

**PRAYER FOR RELIEF**

While reserving the right to seek additional damages and plead additional causes of action as available, Plaintiff demands judgment against Defendant as follows:

A. Injunctive relief and a declaratory judgment in favor of Plaintiff against Defendant, declaring that Defendant has violated the law by discriminating against and retaliating against Plaintiff;

B. On all applicable causes of action, back pay and benefits and front pay and benefits, plus compensatory damages;

C. On all applicable causes of action, an award of punitive damages in an amount to be determined at trial;

D. All costs and disbursements of this action, including reasonable attorneys' fees; and

E. Any other further relief the Court may deem just and proper.

. **JURY DEMAND**

Plaintiff demands trial by jury of all issues as of right by a jury.

Dated: May 24, 2021           STOLL, GLICKMAN & BELLINA, LLP

By: *[signature]*

Rita A. Sethi, Esq.
300 Cadman Plaza West, 12th floor
Brooklyn, New York 11201
(718) 852-3710
rsethi@stollglickman.com
*Attorneys for Plaintiff*

14